951 A.2d 346

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Benjamin GREER, Appellee.**

Supreme Court of Pennsylvania.

Argued April 16, 2007.

Decided July 24, 2008.

374

William George Young, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Mark S. Keenheel, Esq., Maplewood Mall Law Center, for Benjamin Greer.

Chief Justice CASTILLE.

The question on appeal is whether the trial court abused its discretion in issuing *Spencer*[1] instructions—that is, instructions to a deadlocked jury to continue to deliberate, with an open mind to reconsideration of views, without giving up firmly held convictions—in an instance where the jury foreperson volunteered to the trial court the fact of the deadlock as well as the numerical division among the jurors and the identity of the holdout jurors.[2] A divided Superior Court panel held that the *Spencer* instructions were impermissibly coercive, primarily relying upon authority from the U.S. Court

---

**1.** *Commonwealth v. Spencer*, 442 Pa. 328, 275 A.2d 299 (1971).

**2.** This sort of instruction has also been referred to as a "dynamite charge." "The *Allen* or 'dynamite' charge is designed to blast loose a deadlocked jury." *Green v. United States*, 309 F.2d 852, 854 (5th Cir.1962) (footnote omitted) (construing *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)) *see also* 6 WAYNE R. LaFAVE ET AL., CRIMINAL PROCEDURE § 24.9(d), at 519–20 (3d ed.2007).

of Appeals for the Ninth Circuit. For the reasons that follow, we find that the trial court's instructions neither ran afoul of *Spencer* nor were they coercive, and thus, there was no abuse of discretion warranting a new trial. Accordingly, we vacate the new trial order below and remand to the Superior Court for consideration of appellee's remaining appellate claim.

On February 5, 2004, Bin Zhang was working at the Golden Dragon Restaurant in Philadelphia when he received a telephone call requesting a food delivery. Zhang recognized the number as one used in a previous robbery, and so he called the police. In response, the Burglary Detail Unit of the Philadelphia Police Department posted officers at the delivery address. Meanwhile, at the instruction of the officers, Zhang took an empty box to that address. When Zhang arrived, he was approached by two men who took his cell phone and then attempted to flee. One man escaped, but the second man, appellee Benjamin Greer, was thwarted by Zhang, who grabbed his clothing. Appellee and Zhang fell to the ground, causing Zhang to break his ankle. The police then apprehended appellee, who was charged with criminal conspiracy, aggravated assault, and robbery.

Appellee was tried by a jury sitting before the Honorable Gary S. Glazer. After two days of testimony, the jury began deliberations late in the afternoon of February 10, 2005, breaking after less than an hour that day. The jury resumed deliberations the following morning. The jury then sent a note to Judge Glazer, asking that certain testimony be read back and seeking clarification regarding the law of criminal conspiracy. The relevant testimony was read back to the jury, Judge Glazer gave a supplemental instruction, and deliberations resumed at approximately 11:00 a.m. That afternoon, the jury sent the first of two additional notes to Judge Glazer. The first note, which was signed by the jury's forewoman and stated that it was written at 12:30 p.m., volunteered that the jurors had reached a verdict of not guilty on the robbery charge, but were unable to reach a verdict on criminal conspiracy and aggravated assault. The note also volunteered that the jurors were divided 10–2 in favor of guilt for conspiracy,

with jurors nine and ten favoring a not guilty verdict; and that juror number ten was the sole juror in favor of a not guilty verdict for aggravated assault. The note further volunteered that the holdout jurors "have reasonable doubt about evidence." At no point had Judge Glazer inquired as to the numerical split of the jury or the identity of the jurors in the minority.

At 1:30 p.m., Judge Glazer informed trial counsel that he had received a note from the jury stating that it was having difficulty reaching a verdict on conspiracy and aggravated assault, but he did not reveal that the note also outlined the numerical division of the jury, the identities of the "holdout" jurors, and their concerns. Judge Glazer suggested issuing a jury charge deriving from *Commonwealth v. Spencer*, 442 Pa. 328, 275 A.2d 299 (1971), i.e., a non-coercive charge instructing the jurors to be true to their convictions, but to reconsider their original views. Both attorneys agreed, and Judge Glazer issued a supplemental instruction which, *inter alia:*

- stressed that jurors were not expected "to surrender deeply held personal views just to reach a verdict because that would be unfair as well;"
- asked the jurors to go back and isolate the areas where there was an uncertainty, dispute, or issue;
- suggested that the jurors could identify the issue in writing for the court and it could be addressed;
- noted that the parties entrusted the case to the jury for a decision, but the verdict was whatever was the jury's judgment;
- reiterated ("I can't say this strongly enough") that the court did not expect individual jurors "to surrender deeply-held views only to reach a verdict" but rather, "our overriding concern, our overriding interest is that you do justice; that you do what's right, not just reach a verdict so that we can all go home;"
- asked that the jury "spend time, that you deliberate, that you try to isolate what areas divide you and try to reach a reasonable verdict;"

- reiterated the importance of the jury in the criminal justice system; and

- reiterated that the parties were relying on the jury to resolve the case in a way that is "fair and consistent with the law."

Notes of Testimony, 2/11/05, 72–75 (hereinafter N.T.).

Following this charge, the jury again requested that certain testimony be read back and that they be reinstructed on conspiracy. Judge Glazer complied and the jury resumed deliberations at 2:05 p.m. Forty-five minutes later, at approximately 2:50 p.m., the court received a second note signed by the jury forewoman, entitled "Reason for Hung Jury." The note volunteered that: juror number nine was "not convinced" of (1) the police account of how they actually apprehended appellee, and (2) "the discrepancy between" Zhang's testimony and the police testimony; and juror number ten was "not convinced" that the evidence "conclude[d]" that appellee was "the actual perp." Judge Glazer informed counsel of the note, this time also apparently revealing that it identified the hold-out jurors. Judge Glazer suggested that he make "one last comment" to the jury and then take a verdict at 4 p.m. As the court and counsel were discussing the options, the jury was brought back into the courtroom. Judge Glazer then addressed the jury with another *Spencer* charge, which consisted of the following:

> I'm just going to ask that you go back for a little bit. What this indicates to me is either someone is not talking or someone is not listening. And, you know, I mean you owe that to the parties here.

> I mean again, I have a sense of fairness to the people here. That's why you're here. That's why you were picked. You promised us that you would be fair and that you would listen to your fellow jurors, and that you would give us a fair verdict. I mean that's really all that we we're asking for. Parties just want a fair shot which is what everybody is entitled to.

And a jury verdict is a—it's a jury of 12 people speaking as one. And, you know, if it were easy, anybody could do it . . . . But it's not easy.

This is one of the most serious, difficult citizen participation functions that we have in American government . . . . Parties entrust you to reach a verdict.

Now, you're almost there. You're there on one count. But we need your best efforts. We need you to talk. This is not time for people to stand on ego. There's people's lives that are depending on your verdict and on your participation, if you can fairly do so. If you can.

And there's always that caveat because, as I said, you know—this is probably the third or fourth time—don't ask people to surrender deeply-held beliefs just to get out of here and reach a verdict because that's not right.

On the other hand, each of you has views and just judging by what the note says, you're close, but no cigar. So we need you to go back and try to do and resolve this case.

I mean that's—we've been here almost a week. It's a lot of time. It's a lot of your time. I'm here everyday, I work here. But you are serving the system and the community in an effort to reach a verdict, if you can fairly do so.

So I'm going to asking [sic] you to go back. We're not going to keep you here over the weekend. Don't worry about that. We're going to ask you to go back and try because I think you can do it. But just keep an open mind. Listen to each other. Okay? Go on.

N.T., 2/11/05, at 87–90.

The jury resumed deliberations at 3:20 p.m., whereupon appellee objected to the above charge, arguing that it was directed at the two holdout jurors and pressured them to convict. Appellee suggested that the court declare a hung jury on the two deadlocked counts. Judge Glazer rejected the argument, noting that his *Spencer* charge was directed at the jury as a whole, and that "maybe [the two holdouts were] right and the other ten are wrong. You don't know that. I don't know." In the court's view, it had the power "to remind them

of their responsibility to serve and to deliberate and to listen to each other, and reach a verdict, if they can fairly do so." At 3:53 p.m., the jury returned with a unanimous verdict of not guilty on the charge of robbery, and guilty on the charges of criminal conspiracy and aggravated assault. *Id.* at 90–95.

On February 22, 2005, appellee filed a written notice for extraordinary relief which noted, *inter alia,* that counsel had not been made aware at the time of trial that the jury forewoman's first signed note had identified the holdout jurors and the nature of their concerns. Appellee asserted that, because the forewoman had revealed the jury's numerical division and the identity of the holdout jurors, the court should have responded by declaring a mistrial on its own. Citing *Brasfield v. United States,* 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), a case where the judge inquired into the nature of the deadlocked jury's division, appellee forwarded the absolutist claim that "it is a *per se* mistrial when the jury reveals its numerical division." In appellee's view, it did not matter whether the trial court "coerced the jury or encouraged it to disclose its numerical division and the nature and extent of it's [sic] division;" rather, once the division was revealed for any reason, a mistrial was required. Judge Glazer denied the motion and sentenced appellee to three to six years of incarceration for aggravated assault, to run concurrently with a one-to-two-year sentence for criminal conspiracy.

Appellee appealed to the Superior Court and Judge Glazer filed an opinion. Judge Glazer noted that appellee's reliance on *Brasfield* was misplaced because the trial judge in that case had inquired into the jury's division. Judge Glazer noted that such inquiries have been deemed coercive. Here, however, the jury forewoman had volunteered the division without inquiry or prompting; thus, there was no coercion and *Brasfield* was inapposite.

In his Superior Court brief, appellee raised three issues: (1) the trial court erred in failing to disclose the notes forwarded by the jury forewoman; (2) the court erred in failing to declare a mistrial premised on the content of the notes; and (3) the court's instructions after receiving the notes coerced

the jury's verdict. The Superior Court vacated appellee's convictions and remanded for a new trial in a 2–1 published decision. *Commonwealth v. Greer*, 895 A.2d 553 (Pa.Super.2006). The panel focused on the second and third questions in tandem and, because the majority found that the verdict was coerced, it did not address the first issue concerning non-disclosure of the forewoman's notes.

The majority opinion, authored by the Honorable Justin M. Johnson, rejected appellee's argument that *Brasfield* required relief, noting that (1) *Brasfield's per se* approach was not a requirement of due process, but rather, was an exercise of the High Court's supervisory authority over federal courts; and (2) the *Brasfield* Court "explicitly premised its holding . . . on facts which involve a trial court asking the jury for its division," which did not happen in the case *sub judice*. *Greer*, 895 A.2d at 557.[3]

The majority next looked to two cases from the Ninth Circuit—*United States v. Sae–Chua*, 725 F.2d 530 (9th Cir. 1984) and *United States v. Ajiboye*, 961 F.2d 892 (9th Cir. 1992)—noting that those cases outlined a test for determining when an initially deadlocked jury may be deemed to have been coerced into a verdict, where the specifics of the jury's division are volunteered to the trial judge. In *Sae–Chua*, the jury foreman informed the trial court that a majority of the jurors favored conviction, but one juror, who expressed the view that the defendant was guilty, persisted in voting not guilty. The trial court polled the jury as to whether they believed that further deliberations would result in a verdict, and all but one responded affirmatively. The trial court then issued a "modified" charge pursuant to *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), and the jury returned with a verdict of guilty.[4] Employing Circuit precedent interpreting

---

3. The majority nevertheless deemed *Brasfield* to be "instructive as to the potential dangers of jury polling." 895 A.2d at 557 (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 240, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)). There is no issue of jury polling in this case.

4. The *Sae–Chua* court neither quoted nor characterized the modified *Allen* charge which was given. In its discussion, however, it noted that "[i]nstructions admonishing jurors to reconsider their positions have

*Brasfield's* supervisory powers holding, the *Sae–Chua* panel reversed in a very brief opinion. The panel opined that, in some circumstances, "mere disclosure to the judge of the nature and extent of the jury's numerical division has been held to be 'at least as coercive' as the inquiry itself." 725 F.2d at 531 (quoting *Williams v. United States,* 338 F.2d 530, 532–33 (D.C.Cir.1964)). The panel then inferred that the juror who did not think further deliberations would be helpful was the holdout; speculated further that both the trial judge and the holdout juror knew this fact; and then concluded that the *Allen* charge "could only be read by the dissenting juror as being leveled at him … [*i.e.,*] that he, individually, was being urged by the judge to reconsider his vote," which rendered it coercive under the *Brasfield* supervisory line of authority. 725 F.2d at 532–33.

*Ajiboye* also involved the *Brasfield* supervisory rule. The jury in *Ajiboye* sent the trial judge a note indicating that it was split 9–3 in favor of guilt on one count, and 9–3 in favor of not guilty on another, and that it was unlikely there would be a change in the vote. The judge directed the jurors to keep deliberating. A few hours later, the jury reported that it was still deadlocked, without outlining the vote. The judge then issued an *Allen* charge which included an admonition to jurors in the minority: "if the greater number of you agreed on a verdict, the other jurors may want ask themselves about the basis for their feelings when a substantial number have reached a different conclusion." 961 F.2d at 893 n. 1. The next day, the jury requested that certain testimony be re-read. On the following day, the jury returned guilty verdicts on both counts. In an opinion by Judge (now Chief Judge) Alex Kozinski, the *Ajiboye* panel affirmed the convictions, finding that the *Allen* charge was not impermissibly coercive. The panel distinguished *Sae–Chua* because the *Ajiboye* trial court

'been consistently approved in the Ninth Circuit when [they are] in a form not more coercive than that in *Allen.*' " 725 F.2d at 531. We discuss the *Allen* charge at greater length *infra.* For present purposes, it is enough to recognize that such a charge directs jurors to reconsider their views, and particularly focuses upon jurors in the minority, urging them to reconsider in light of the fact that the majority is otherwise inclined.

did not know the identity of the holdout jurors, and thus, no juror could think the *Allen* charge was aimed directly at him or her. The panel then noted other factors that tended to show that the *Allen* charge was not coercive: the jury did not return the guilty verdicts immediately after the charge, but instead deliberated two more days; the jury failed to acquit on the one charge where the vote was initially 9–3 in favor of a not guilty verdict; the jury asked for trial testimony to be reread; and the judge told the jurors "not to 'surrender an honest conviction as to the weight and effect of the evidence simply to reach a verdict.' " 961 F.2d at 894.

Although the Superior Court panel majority below recognized that *Ajiboye* and *Sae–Chua* involved federal supervisory authority, and not federal constitutional law, the majority nevertheless adopted the Ninth Circuit's approach in analyzing appellee's claim. The majority stressed that the trial court here knew the division in the jury, the identity of the holdout jurors, and the reasons they favored not guilty verdicts, and also assumed as fact that the holdout jurors were aware that the judge knew their identities.[5] The majority next looked to the trial court's second *Spencer* charge. The majority recognized that the trial court had conveyed the essence of *Spencer, i.e.,* that the jurors were to listen to each other, and try to reach a verdict, but they were free to maintain deeply-held beliefs and not to abandon them for just any reason. The majority appeared concerned, however, with the trial court's reference to the jury being "close but no cigar," and its direction that "[t]his is not the time for people to stand on ego." Ultimately, the majority opined that the court's knowledge of the jury's division, that a majority favored conviction, and the identity of the holdout jurors required that the otherwise proper *Spencer* charge be viewed in a different light, *i.e.,* as being "directed specifically at the holdout jurors." The majority cited *Sae–Chua* as the sole

5. The majority's assumption respecting what the holdout jurors knew is not supported by the record. The notes were signed only by the forewoman, their contents were not read aloud in court, and there is no affirmative indication in the record whether the other jurors knew the specific contents of the forewoman's notes.

support for its conclusion. Finally, adverting to other Ninth Circuit factors in cases involving *Allen* charges, the majority noted that, following the second charge, the jury had deliberated for only thirty-three minutes and did not ask that any testimony be read back before it returned its split verdict. In light of this "totality," the majority concluded that the charge was coercive and granted a new trial. *Greer*, 895 A.2d at 559–60.

The Honorable Maureen Lally–Green dissented, on grounds that the court's instructions complied with *Spencer* and were not impermissibly coercive. The dissent also noted that the *Spencer* charge in this case was "strikingly similar" to the charge approved by the U.S. Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). *Greer*, 895 A.2d at 561 (Lally–Green, J., dissenting). In *Lowenfield*, the jury deadlocked in the penalty phase of a capital trial. The trial court polled the jury on whether it thought further deliberations would lead to a verdict. Eleven of twelve jurors responded in the affirmative. The court then charged the jury as follows:

Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.

When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion

of your fellow jurors or for the mere purpose of returning a verdict.

484 U.S. at 235, 108 S.Ct. 546. The *Lowenfield* jury returned a verdict of death thirty minutes later. The U.S. Supreme Court upheld the charge in the face of a challenge premised upon both Due Process and the Eighth Amendment, finding that the combination of the jury polling and the supplemental charge "was not 'coercive' in such a way as to deny petitioner any constitutional right." *Id.* at 241, 108 S.Ct. 546.

In Judge Lally–Green's view, there was little substantive difference between the *Lowenfield* supplemental charge and that issued in the case *sub judice*. "The trial court simply informed the jurors that they should listen to one another and use their best efforts to resolve the case, if possible, without sacrificing their own deep beliefs. The trial judge did not direct his comments at the minority jurors." 895 A.2d at 561 (Lally–Green, J., dissenting). Citing to cases from the Fifth, Eighth and Eleventh Circuits, Judge Lally–Green further opined that a foreperson's unsolicited disclosure of a jury's division "does not preclude a trial judge from giving an otherwise unobjectionable charge." *Id.* Rather, the court's knowledge of the division is but one factor in the *Spencer* analysis. Finally, the dissent was unpersuaded by the *Sae–Chua* court's focus on the trial judge's supposed knowledge of the holdout juror(s)' identity. In the dissent's view: "That the trial judge did not inquire as to the jury's division should ... carry significant weight. In addition, I believe that an appellate court should be wary of speculating that the psychological effect of a *Spencer* charge was to coerce minority jurors to surrender to the majority view, especially where the explicit terms of the charge comply fully with the *Spencer* guidelines." *Id.* at 562.

■■■■ This Court granted the Commonwealth's request for discretionary review. We review jury charges, including supplemental jury charges, for an abuse of discretion. *Commonwealth v. Santiago,* 492 Pa. 297, 424 A.2d 870, 873 (1981) ("Whether to give a *Spencer* charge is a matter for the exercise of the trial court's sound discretion."). Further, the

question of the proper duration of jury deliberations is one that rests "within the sound discretion of the trial court, whose decision will not be disturbed unless there is a showing that the court abused its discretion or that the jury's verdict was the product of coercion or fatigue." *Commonwealth v. Moore,* 594 Pa. 619, 937 A.2d 1062, 1077 (2007). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Dengler,* 586 Pa. 54, 890 A.2d 372, 379 (2005) (quoting *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038, 1046 (2003)).

The use of supplemental charges to the jury "has long been sanctioned." *Lowenfield,* 484 U.S. at 237, 108 S.Ct. 546. Moreover, this Court in *Spencer* recognized that, "[d]eadlocked juries are a matter of concern to both the bench and the bar." 275 A.2d at 304. On the other hand, *Spencer* also emphasized that a conviction will be reversed if it was coerced by the court's charge. *Id.* at 303; *accord Lowenfield,* 484 U.S. at 241, 108 S.Ct. 546 ("Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body.").

Proper disposition of this appeal requires appreciation of the origins and subsequent experience of the *Allen* charge, particularly as the charge has been employed in Pennsylvania. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) involved a federal capital prosecution. The judge's supplemental charge in *Allen* is not set out verbatim in the opinion; rather, the High Court summarized the substance of the charge as follows:

> [T]hat in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be con-

vinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

164 U.S. at 501, 17 S.Ct. 154. The *Allen* Court found "no error" in this charge, emphasizing that:

While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself.

*Id.* at 501–02, 17 S.Ct. 154. Nothing in the *Allen* opinion suggested that the rule thus stated was of constitutional dimension.

The *Allen* charge came to be commonly used in both the state and federal courts, but over time, various courts raised concerns respecting that part of the charge encouraging jurors in the minority to reconsider their views in light of the majority vote, with the fear being that such an emphasis might be unduly coercive. *See* 6 WAYNE R. LaFAVE ET AL., CRIMINAL PROCEDURE § 24.9(d), at 519–21 (3d ed.2007) (tracking history of *Allen* charge). Nevertheless, the U.S. Supreme Court has not disavowed the *Allen* charge; to the contrary, in *Lowenfield,* the Court emphasized that "[t]he continuing validity of this Court's observations in *Allen* are beyond dispute, and they apply with even greater force in a case such as this, where the charge given, in contrast to the so-called 'traditional

*Allen* charge,' does not speak specifically to the minority jurors." 484 U.S. at 237–38, 108 S.Ct. 546.

Strict constitutional concerns aside, courts have taken greater control over supplemental charges as a supervisory matter. The U.S. Supreme Court did so in *Brasfield, supra*, where the issue was not the propriety of the *Allen* charge, but the distinct and narrower question of the propriety of the trial judge inquiring into the numerical division of the jury. Other courts have taken on the specifics of the *Allen* charge, motivated by a concern with jury coercion, a concern with constitutional implications. This brings us to *Spencer.*

*Spencer* was litigated in the trial court specifically to test the vitality of *Allen* deadlock charges—*i.e.*, the trial judge was disinclined to so charge the deadlocked jury but relented, upon request of the District Attorney, "if for no other reason than to test [*Allen's* ] continuing validity." 275 A.2d at 302. The supplemental charge issued in *Spencer* tracked the substance of *Allen*, including the focus upon "dissenting jurors" reconsidering their views in light of the inclination of the majority. The issue on appeal was whether the *Allen* charge has a prohibited coercive effect. The defendant argued that the portion of the charge which directed jurors in the minority to listen with deference to the majority and re-examine their minority position implied two troublesome points: (1) that jurors in the minority should yield to the majority; and (2) that those without reasonable doubt (the majority) need not re-examine their position despite the existence of reasonable doubt in the mind of a minority juror. *Id.* at 303–04. *Spencer* noted that "each notion is contrary to the hallowed tradition of trial by jury" secured by both the federal and the Pennsylvania Constitutions. *Id.* at 304. We then summarily noted our agreement with "the vast majority of jurisdictions that the *Allen* charge contains these potential abuses," and therefore declared (presumably as a supervisory matter, since we made the rule prospective only) "that the *Allen* charge should not be employed by trial judges of this Commonwealth after the date of this opinion." *Id.* (emphasis omitted).

With respect to concluded trials, however, *Spencer* stated that consideration would be on an *ad hoc* basis, with a view to determining "whether or not the *Allen* charge unduly influenced the jury." *Id.* We then held that the *Allen* charge did not so influence the *Spencer* jury. In so holding, we approved of the Superior Court's analysis, which had emphasized that: the jury's verdict came seven hours after the *Allen* charge; in those seven hours, the jury had deliberated for three separate intervals; the jurors also had a leisurely dinner in that time; and the jury asked that certain testimony be read back, indicating awareness of its duty—all of which was "not the mark of a coerced jury," rendering any error in the *Allen* charge harmless. *Id.* (citing *Commonwealth v. Spencer*, 216 Pa.Super. 169, 263 A.2d 923, 926 (1970)).

Finally, *Spencer* cited with approval to then-recently promulgated guidelines from the American Bar Association governing jury deadlock, noting that "[s]uch guide lines may avoid the evils inherent in the *Allen* charge and with proper usage may aid in the alleviation of problems which arise when juries are deadlocked." *Id.* at 305. Those guidelines provided as follows:

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of

the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a).

*Id.* at 304 n. 7.

With this background in mind, we turn to this appeal. The Commonwealth argues that the supplemental charge here was proper under *Spencer*, and posits that *Spencer* instructions that would normally be considered non-coercive do not become coercive simply because the jury voluntarily reveals its numerical split and the identity of the holdout jurors. The Commonwealth maintains that the panel majority below plainly erred in relying upon non-binding Ninth Circuit authority because those decisions: (1) misapply the U.S. Supreme Court's supervisory decision in *Brasfield*, which governs situations where the court inquires into the jury's division, which did not happen here; (2) the decisions are contrary to the weight of authority in situations where it is the jury that volunteers its division,[6] including decisions by prior Superior Court panels in such scenarios;[7] and (3) the decisions are contrary to this Court's teachings in *Spencer*. The Commonwealth further notes that, in relying upon the Ninth Circuit cases, the panel majority failed to appreciate that the supplemental charges in those cases were some form of the *Allen* charge—*i.e.*, a charge

**6.** The Commonwealth cites the following federal cases in support of the proposition that the *Brasfield per se* rule does not apply when the jury volunteers its division: *United States v. Parsons*, 993 F.2d 38, 42 (4th Cir.), *cert. denied*, 510 U.S. 898, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993); *United States v. Brokemond*, 959 F.2d 206, 209 (11th Cir.); *United States v. Norton*, 867 F.2d 1354, 1365 (11th Cir.1989), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989); *United States v. Hotz*, 620 F.2d 5, 6–7 (1st Cir.1980); *United States v. Kahaner*, 317 F.2d 459, 484–85 (2d Cir.), *cert. denied*, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963); *Bowen v. United States*, 153 F.2d 747, 752 (8th Cir.), *cert. denied*, 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611 (1946). *See* Commonwealth's Brief at 19–20.

**7.** *See* Commonwealth's Brief at 20–21 (citing *Commonwealth v. Boyles*, 407 Pa.Super. 343, 595 A.2d 1180 (1991) and *Commonwealth v. Cook*, 383 Pa.Super. 615, 557 A.2d 421 (1989)).

directing jurors in the minority to reconsider their positions in light of the majority view. The trial judge here, in contrast, followed *Spencer* and did not so target the minority jurors. The Commonwealth further argues that the general rule that has emerged outside of the Ninth Circuit considers supplemental jury charges complying with ABA standards to be non-coercive provided that the jury disclosed the split voluntarily and the instruction does not focus on the minority jurors.[8] The Commonwealth argues that the *Spencer* charge here was consistent with that generally prevailing rule.

The Commonwealth posits that a *Spencer* charge should not be deemed coercive, even if the judge is aware of the numerical division in the jury and the identity of the minority jurors, so long as the instruction properly directs jurors not to surrender their honest or strongly held convictions for the mere sake of rendering a verdict. In this case, the Commonwealth submits, Judge Glazer's supplemental instructions were neither coercive nor directed at the holdouts. Far from being coercive, Judge Glazer's second *Spencer* charge informed the jury that it would be dismissed at the end of the day and would not be held over the weekend. The Commonwealth further notes that Judge Glazer's charge was directed at the entire jury, not the holdouts, informing the entire jury of the importance of reaching a verdict, and asking all to further deliberate and try to resolve their differences while, at the same time, repeatedly emphasizing that no juror should surrender strongly held beliefs merely to reach a verdict. The jury was not told that it **had** to reach a verdict, and the minority jurors were not told to show deference to the majori-

8. *See* Commonwealth's Brief at 22–23 (citing, *inter alia, United States v. Frost,* 125 F.3d 346, 375–76 (6th Cir.1997), *cert. denied,* 525 U.S. 810, 119 S.Ct. 40, 41, 142 L.Ed.2d 32 (1998); *United States v. Lash,* 937 F.2d 1077, 1086 (6th Cir.), *cert. denied,* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991); *United States v. Robinson,* 560 F.2d 507, 517 (2d Cir.1977) *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *United States v. Jennings,* 471 F.2d 1310, 1313–14 (2d Cir.), *cert. denied,* 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973); *Gafford v. Warden,* 434 F.2d 318, 319 (10th Cir.1970); *Sanders v. United States,* 415 F.2d 621, 631–32 (5th Cir.1969), *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970)).

ty. In such a circumstance, the Commonwealth concludes, the trial court cannot be deemed to have abused its discretion.[9]

Appellee responds first by isolating the portions of the trial court's second *Spencer* charge which stated, "[t]his is not [the] time for people to stand on ego" and "each of you has views and just judging by what the note says, you're close, but no cigar." Appellee declares, without elaboration or explanation, that this language "was clearly directed to the dissenting jurors and contained the coercive effect of an *Allen* charge[.]" Appellee's Brief at 14. Echoing (indeed simply quoting) the reasoning of the panel majority below, appellee also invokes the Ninth's Circuit's *Sae–Chua* decision and argues that the minority jurors' knowledge that the court was aware of their status means that the minority jurors would have construed the supplemental charge as being aimed solely at them. (Like the panel majority, appellee appears not to recognize that the charge in *Sae–Chua* was an *Allen* charge, not a *Spencer* charge.)

Appellee further posits that the *Spencer* charge should be deemed to be designed only for use in what he calls a "neutral environment," where the numerical division of a deadlocked jury is unknown to the trial court. Appellee argues that any *Spencer* charge should be deemed *per se* coercive in a case such as this, because the holdout jurors were a "substantial minority" (two of twelve), they were aware that the trial judge knew their identity as minority jurors, and they therefore would have interpreted **any** supplemental charge as being directed only at them, and not at the jury as a whole. Appellee suggests that to hold otherwise requires a belief that

9. The Commonwealth also argues that, because the note to the judge disclosing the jury's numerical division and the identities of the holdout jurors was prepared by the jury forewoman, it is "pure speculation" to assume that the other jurors knew the contents of the note. Appellee counters that any communications to the trial court must be considered as coming from the jury as a whole, and merely signed by the foreperson. For purposes of decision, we will assume that the jury was aware of the contents of the forewoman's notes. Finally, the Commonwealth forwards an argument premised upon Pa.R.Crim.P. 648(F), which appellee rebuts. In light of our disposition, we need not address this distinct argument.

one or two jurors could sway the rest even after substantial deliberations have occurred, a prospect he apparently deems to be fatuous. In appellee's view, it does not matter how the trial judge learned of the nature of the jury's division. Appellee goes so far as to say there must be a *"per se* mistrial" in a scenario like this one, because the effect upon the minority jurors "could never be known."

Appellee also urges this Court to adopt a multi-factor analysis such as that identified in the Ninth Circuit's *Allen*-based decision in *Ajiboye,* 961 F.2d at 894. Appellee's counsel ultimately proposes a two-part *per se* rule he would name after himself, to govern situations where the trial court learns of the numerical division within the jury by any means. Appellee poses that, if (1) the jury has been deliberating for a substantial amount of time; and (2) a "substantial minority" exists (meaning the vote is 11–1 or 10–2), then, the trial court simply cannot issue a *Spencer* charge without the defendant's consent to further deliberations.

Preliminarily, we note our agreement with the Commonwealth that the Ninth Circuit cases do not support the proposition that the jurors in the minority must have deemed the *Spencer* charge here to be aimed peculiarly and coercively at them. For one thing, the Ninth Circuit is out of step with the majority of federal circuits on the *Allen/Brasfield* question addressed in *Sae–Chua* and *Ajiboye.* But, more fundamentally, the cases are inapposite because they involve *Allen* charges, *i.e.,* charges squarely addressed to minority jurors to reconsider their views precisely because they are in the minority. The whole point of *Spencer* was to remove that focus—as a supervisory matter of Pennsylvania law. Furthermore, the Ninth Circuit cases are inapposite because they are also part of a line of cases deriving from *Brasfield,* which involved a per se federal supervisory rule prohibiting inquiry into a jury's division. Pennsylvania is not a *Brasfield/Allen* jurisdiction. This Court has imposed no *per se* supervisory rule in Pennsylvania concerning inquiries into jury divisions, much less have we held that such a rule, once imposed, should be extended to

prohibit issuing non-coercive *Spencer* charges **anytime** the Court learns the identity of initial holdout jurors.

■ For similar reasons, the multi-factor test the panel majority below imported from the Ninth Circuit authority is inapposite because, by definition, that test addresses itself only to circumstances where an *Allen* charge has issued. Notably, in *Spencer,* this Court employed a similar approach to evaluate the effect of the *Allen* charge there issued. We engaged in that totality of circumstances analysis precisely because *Allen* charges "contain the[ ] potential abuses" of suggesting that minority jurors should yield to the majority, and that the majority need not re-examine their positions in light of the minority jurors' views. *Spencer,* 275 A.2d at 304 (emphasis omitted). Where no such potentially coercive *Allen* charge is given—as, for example, where a *Spencer* charge is given—nothing in this Court's jurisprudence requires the Ninth Circuit's *Allen/Abijoye* test.

■ Unfortunately, the Superior Court made this a more difficult case than it should have been. The panel majority was led astray by failing to recognize the fundamental distinction between an *Allen* charge and a *Spencer* charge—a distinction that directly addresses coercion. The court should have focused more narrowly on the relevant question of Pennsylvania law, which is whether the supplemental charge in this case comported with *Spencer* or was unlawfully coercive. Joining that question squarely now, we see no abuse of discretion by the trial court.

First of all, the supplemental charge did not begin to approach the substance of the supplemental *Allen* charge that this Court found to be potentially coercive in Spencer. The trial court here, like the trial court in *Lowenfield, supra,* did not purport to separately address the jurors in the minority, nor did it suggest to jurors holding a minority view that they should defer to the majority view. The court did not say anything along the lines of "a dissenting juror should consider whether his doubt is a reasonable one if it made no impression upon the minds of so many other jurors." Nor did the court

suggest that jurors in the minority should "distrust [their] own judgment" because their views differ from that of the majority. *See Spencer,* 275 A.2d at 303 (quoting *Allen* charge). Rather, the trial court addressed the jury as a whole, and while repeatedly advising the jurors that they were not expected to surrender deeply-held views, reminded them of their duty and function, and directed them to continue to deliberate and to try to reach a verdict. In addition, as the Commonwealth has stressed, the court did not pressure the jury to reach a verdict under pain of being inconvenienced over the upcoming weekend; rather, it made clear that the jury would not be kept over the weekend.[10]

Second, we are not persuaded by the argument that the fact that the court knew the nature of the jury's numerical division and the identity of the holdouts (here, via volunteered information from the jury forewoman) can make an otherwise non-coercive *Spencer* charge coercive. While the U.S. Supreme Court held in *Brasfield* that inquiry into the numerical division of a jury is inappropriate as a supervisory matter, and the Ninth Circuit equates any knowledge of the division as a basis to preclude giving an *Allen* charge, this Court has never held, for *Spencer* purposes, that the Court's awareness of the jury's division precludes issuing a non-coercive *Spencer* charge. Indeed, in *Commonwealth v. Moore, supra,* this Court recently found no abuse of discretion in the trial court's issuing a Spencer-type of charge in a situation where the jury had volunteered that it was divided 11–1 on a penalty verdict in a capital case. The defendant in *Moore* argued that the charge placed an "impermissible burden on the holdout juror," in effect instructing the holdout " 'to try to deliberate and see if you can make the agreement unanimous.' " In addressing the defendant's argument premised upon the court's awareness of the jury's numerical division, we reasoned as follows:

10. *See* LaFave, *supra,* § 24.9(d), at 521 n. 47 (noting that some courts have condemned other potentially coercive actions, such as threatening sequestration, or issuing "time fuse" instruction that it will order mistrial unless verdict is reached by certain time).

As Appellant observes, the jury had revealed its numerical split to the trial court. When the jury voluntarily reveals such information, a number of courts have observed that the judge has a heightened duty to avoid utilizing coercive language in its supplemental charge. *See, e.g., Desmond v. State,* 654 A.2d 821, 827 (Del.1994). Although the trial court sought further information concerning the nature of the jury's numerical division ..., the trial court did not utilize this information in the instructions that followed. Instead, the trial court focused upon the relatively brief amount of time that the jury had deliberated and instructed them to "[g]o back, have open minds, try to deliberate and see if you can make the agreement unanimous." ... Although Appellant maintains that the trial court was speaking solely to the holdout juror, we conclude that the trial court's instruction was directed to all of the jurors, particularly as the impetus for the instruction stemmed from the brief period of time that the jury had deliberated.

*Moore,* 937 A.2d at 1077–78.

The circumstances here are not the same as in Moore. In the case sub judice, there was a greater passage of time, the court addressed the jury twice, and the charge was more extensive. However, the charge still was addressed to the jury as a whole and did not purport to single out the jurors in the minority. We do not believe that the court's awareness of the division in the jury made the charge coercive.

■ Turning to the fact that the court was aware of the identity of the holdouts, we likewise do not believe that that fact renders an otherwise proper *Spencer* charge unlawfully coercive. Again, unlike in the *Allen* situation (and the Ninth Circuit cases speaking to that situation), a proper *Spencer* charge does not address jurors in the minority separately, but directs all jurors to be open to reconsideration. More importantly, as a matter of logic, the jurors already are acutely aware of where they stand relative to the private jury vote—whether the specific outcome of that poll is revealed to the trial court or not. No doubt, jurors in a minority position always feel some form of pressure to bow down to the will of

the majority.[11] By the same token, a charge to continue deliberating theoretically could cause jurors in a majority position to feel pressure to switch views, if only to get the matter over with. Indeed, it is also possible that jurors may want to just throw up their hands at the first sign of disagreement and declare themselves deadlocked in the hope they will be discharged from service. These sorts of ephemeral psychological pressures are both inherent in the jury function and difficult to measure. We agree with the dissent below that we should tread carefully before allowing speculation about such effects to control the relevant jurisprudence.

 Nothing in the law requires that deliberations be aborted because jurors may feel uncomfortable in being directed to listen to each other and to attempt to hammer out their differences. Indeed, if avoidance of conflict or discomfort were the prime directive, we could do away with deliberation entirely and tally private, individual votes from the jury. As the *Allen* Court noted, and the *Lowenfield* Court reaffirmed:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Lowenfield,* 484 U.S. at 237, 108 S.Ct. 546 (quoting *Allen,* 164 U.S. at 501–02, 17 S.Ct. 154). To this, we would add (and this is what *Spencer* refines *Allen* to accomplish), there is nothing

11. Even if the trial court is completely unaware of the nature of the jury's division, a charge to continue deliberating may cause jurors in the minority to feel more pressure to change their views than jurors in the majority.

improper in directing all jurors to be open to the arguments of their fellow jurors.

 Finally, we turn to the two phrases in the court's second *Spencer* charge which were of particular concern to the panel majority, *i.e.*, the statements that "[t]his is not [the] time for people to stand on ego," and that "each of you has views and just judging by what the note says, you're close, but no cigar." We fail to see the coercive effect of telling jurors not to "stand on ego." The expression "close but no cigar" is more troublesome, and it would have been better to avoid that language. But, we do not believe the phrase altered the essentially non-coercive charge that was issued. Again, the court was careful to direct its charge to the jury as a whole, and emphasized, yet again, that jurors were not to surrender deeply-held beliefs merely to reach a verdict. Nor did the court suggest that jurors in the minority had a special obligation to reconsider, over and above that of all the jurors. Finally, the general thrust of the charge was rather modest. The court began this portion of the charge by stating, "I'm just going to ask that you go back for a little bit" and ended it by saying: "We're going to ask you to go back and try because I think you can do it. But just keep an open mind. Listen to each other. Okay? Go on." This hardly smacks of coercion. We see no abuse of discretion in the charge.

For the foregoing reasons, we vacate the order of the Superior Court and remand to that court for consideration of appellee's remaining appellate claim.

Former Chief Justice CAPPY, former Justice BALDWIN, and former Justice FITZGERALD did not participate in the decision of this case.

Justice EAKIN and BAER join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

Although I ultimately agree with the majority's determination that the challenged supplemental charge was not unduly

coercive, I would employ a modestly different analysis in reaching that result.

The majority criticizes the Superior Court for utilizing an evaluative framework based on federal decisions analyzing the coerciveness of charges given along the lines of the one at issue in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Specifically, the majority finds such an approach inapposite because the second supplemental instruction in the present case was more in line with the one approved by this Court in *Commonwealth v. Spencer,* 442 Pa. 328, 275 A.2d 299 (1971). While I agree that the instruction here overlapped substantially with *Spencer,* the overarching concern expressed in that decision—especially relative to the *Allen* charge—was the prospect of a coerced jury verdict in view of the possible effect of the supplemental instruction on jurors in the minority. *See id.* at 335, 275 A.2d at 303. Indeed, *Allen* has generally been seen as problematic in this regard—and its use was prospectively foreclosed by *Spencer*—precisely because of the possibility that minority jurors would feel pressured by the trial judge to vote, against their true beliefs, with jurors in the majority.

Presently, while the trial judge qualified his language with many of the beneficial aspects of *Spencer,* he also suggested, after learning of the 10–2 split, that "[w]hat this indicates to me is that someone is not talking or someone is not listening," "you're almost there," and "you're close but no cigar." I believe that these types of admonitions might be perceived as being directed primarily toward the dissenting jurors, much in the same fashion as an *Allen* charge. *See Allen,* 164 U.S. at 501, 17 S.Ct. at 157 (reciting the challenged instruction which suggested that minority jurors should reconsider their position in light of the majority view). The first reference—reflecting the trial judge's belief that "someone is not talking or someone is not listening"—might be taken by jurors as a criticism of their conduct in the deliberations. Particularly given that trial judges have limited information regarding the actual dynamics of jury deliberations as they unfold in the jury room, and jurors must adhere to their "individual judgment" and

"honest conviction as to the weight or effect of the evidence," *Spencer,* 442 Pa. at 338 n. 7, 275 A.2d at 304 n. 7 (citation omitted), I believe these types of comments should be avoided.[1] Likewise, the references to the jurors being "almost there" and "close but no cigar" seem to me to beg the question, "close to what?" In circumstances in which ten jurors favor conviction, such references could reasonably be regarded as being directed toward the minority jurors.

Because this type of language may cause an otherwise proper *Spencer* charge to encroach into *Allen* territory, I do not find the Superior Court's reasoning untoward to the extent it sought guidance from federal *Allen* jurisprudence in assessing prejudice. In this regard, it bears observation that both *Spencer* and the federal *Allen* jurisprudence share an overarching goal of protecting a defendant's right to a fair trial in the face of potentially coercive actions taken by a trial judge facing a deadlocked jury, particularly where only one or two jurors are in the minority. Furthermore, because of the endless variety of ways in which a trial judge can phrase anti-deadlock instructions—and as illustrated by this case—it is not always possible to place such charges into neat *Spencer*-versus-*Allen* categories.

I am ultimately able to join the result reached by the majority because, in my view, any potential coercion by the trial judge was adequately ameliorated by the remaining portions of the charge reflecting *Spencer* principles. Left to my own devices, however, I would accompany the disposition with a caveat to the effect that trial courts should do their best to adhere to the guidelines approved in *Spencer,* and avoid any additional types of collateral remarks that could carry a risk of having coercive effects.

1. As this portion of the charge is not challenged in Appellee's brief, however, I do not believe that it should be relied upon as a basis for relief.